WILLIAM HARWOOD, Plaintiff in Error, *v.* JOHN W. JOHNSON and GEORGE H. KIERSTED, Defendant in Error.

ERROR TO MORRIS COUNTY COURT.

Where a party has disposed of property, being misled by the false pretenses of the purchaser, and has taken a note for the payment, and is about to reclaim it from the vendee, if a third party, upon being informed of the facts, puts his name to the note as security, two days after it was given, by reason whereof the property is not reclaimed, such third party will be liable in an action on the note.

SUMMONS issued Oct. 20th, 1856; summons returned by sheriff, served by reading the same to George H. Kiersted, Oct. 20th, 1856, and that John Johnson was not found.

The declaration was on a note, dated February 16th, 1856, executed by defendants, and payable to plaintiff, for one hundred and twenty-five dollars, with use.

There was a count for goods sold and delivered; for money lent and advanced to, and paid, laid out, and expended for defendant; for money had and received to and for the use of the plaintiff.

Plea, non-assumpsit, by George H. Kiersted, and similiter by plaintiff.

Jury find a verdict, no cause of action; motion by plaintiff to set aside verdict, and for a new trial,

1st.    Because the verdict is against the evidence.

2nd.    Because the verdict is against the instructions of the court, on the part of plaintiff.

3rd.    Because of the instructions given by the court to the jury, on part of defense, and objected to by plaintiff.

This motion was overruled by the court, and the following bill of exceptions was thereupon filed:

And now, to wit, March 3rd, A. D. 1857, this cause came on to be tried before the court and a jury, and the plaintiff gave in evidence a note, in the words and figures following:

MORRIS February 16, 1856

on or Befour the tenth Day of March next Eye Promis to Pay to William Harwood or order one hundred and twenty five Dollers for Value Rec with use.

JOHN W JOHNSON

Security  GEO H KIERSTED.

Here the plaintiff rested his case.

The defendant then called *William T. Hopkins*, who testified that he never saw the note; that Teter asked him if he (Hopkins) had sold a farm to Johnson; told him no; told him Johnson did not own the farm he lived on; that it was a farm he rented of him (Hopkins); Teter then said Harwood had sold Johnson a horse; that Johnson had said he owned a farm; told Teter that Johnson was not good for the horse; that he was preparing to go away. This conversation was on Monday, February 18th, 1856; the horse was sold on Saturday previous. Harwood was present, and said he had sold a horse to Johnson for $125, on his representing that he was worth a farm and horses; said he had delivered the horse, and think he said he had taken the note; the note corresponds with the price; told Harwood Johnson had obtained his horse through fraud, to go and give up his note and take his horse; that whilst they were talking, Johnson came into town with a team; told Teter and Harwood to go and take the horse; they started after Johnson, and soon returned and said they had fixed it; that Kiersted had gone security on the note; that his impression is it was on Monday; bought the horse of Johnson the same day; think Teter consulted him on Saturday or Sunday previous, but his recollection is indistinct.

Cross-examined.  Knew Johnson two years before the note was given; he had no interest in the "Le Bar" farm; it was owned by Butler; one hundred acres of the farm were improved; Johnson had no contract for the purchase of the farm, and he never paid anything on it; was the agent of Butler; superintended the renting of the place; Johnson rented it; John-

son owned no land to his knowledge; knew his circumstances; if he had owned any, should have known it; leased him the Le Bar farm; Johnson had some horses, think three; they were mortgaged to Reading and Hopkins, to secure them on a bond signed by them to Stone Petersen; the mortgage was as much, or nearly as much, as the horses were worth; Johnson had no other property that he knew of; advised Harwood to go and take the horse where he might be found, and if they could not get him, would have a writ of replevin issued for him; Johnson's lease of the Le Bar farm had expired at the time of the sale of the horse.

Examination in chief resumed. Told Harwood Johnson was about to run away; that he was giving his notes and getting property; Johnson left the county about the 10th of March, 1856; has not returned since.

*George Brady*, called and sworn on part of the defense, said, he remembered a conversation between Harwood and Kiersted about a year since; that Kiersted called to him to note a remark made by Harwood; Harwood admitted that he knew Johnson was going away for some time previous; Kiersted said he was not treated fair, he ought not to pay the note; if he had known Johnson was going away, he could have detained him; nothing was said about the signature; did not know whether Harwood said he had told Kiersted Johnson was going away; did not recollect that Harwood claimed to have told Kiersted that Johnson was going away; Kiersted claimed in the conversation that Harwood knew Johnson was going away, and did not inform him of that fact.

Cross-examined. Paid no attention to the conversation until my attention was called; they were in his store; was attending to the business of his store; heard nothing until his attention was called; they were disputing—talking loudly and excited; that Harwood might have asserted some things and he not have heard them; it was a busy day; they were put out with each other and excited; only heard what Kiersted called him to note; heard nothing afterwards; paid no further attention.

The plaintiff then called *John W. Teter*, who testified, that he was present when the note was given; that it was in his hand-writing; the parties came to his house, Saturday, after dark; Johnson asked him if he would write him a note for Harwood; Johnson said he had bought his (Harwood's) mare; that Harwood was no scholar; Harwood then said that he was about to sell Johnson his mare, but did not know whether he would let him have her or not; that he did not know him; that he (Teter) felt interested for Harwood, who was a poor, and honest, and industrious man, without education, and called on

him generally to do his business for him; asked Johnson about his responsibility; he said he had bought the Le Bar farm; that he had paid $2,500 for it; said he owned three other horses, and wanted this to make up a team, as there was one hundred acres broke on the farm, and it would need two teams; said he had four or five head of cattle; that he had 600 or 1,000 bushels of corn on hand, but did not want to sell it until he could get a better price; that he expected to get the money to pay for the mare from his father-in-law, and therefore wanted ten days longer on the note; that he (Teter) then wrote the note and handed it to Johnson, and he handed it to Harwood; Johnson said he always paid his notes when due, and this we could learn from Hopkins and Bishop, in Morris; that Harwood recently came to him (Teter) to attend to his business; wrote most of his letters; saw Harwood give the horse to Johnson; came to town with Harwood on Monday morning; called on Hopkins for the purpose of ascertaining about Johnson's responsibility; went to Hopkins alone; asked him whether Johnson had bought the " Le Bar " farm; he replied, no, that the farm was sold to some man in New York; that Johnson had no horses; that Johnson had two or three horses, but they were mortgaged to Reading & Hopkins; that Johnson owned no cattle; that he had the use of a cow owned by him (Hopkins); that Johnson owned no corn, but had been stealing his (Hopkins') corn, and selling it in Morris; told Hopkins of the bargain between Harwood and Johnson; Hopkins said, go and take the mare, Johnson is going to run away; went on the street; met Harwood; told him what Hopkins had said; Johnson came along with a team; had the mare in it; went to him, and Harwood said to him that he wanted his horse; that he had got him under false pretenses; Harwood was very angry; that he (Teter) then said to Johnson, Harwood wants his mare, as you have obtained her by false pretenses; Johnson asked him who said so; told him Hopkins; Johnson then said if Harwood was not satisfied, he would give him security; told him that Hopkins said that he (Johnson) did not own the Le Bar farm; he said he had bought it, and paid $500 on it; that he wanted Harwood satisfied; went with Johnson down street, to hunt Kiersted; found him in Ross' grocery; Johnson asked Kiersted to go on his note; Kiersted said he would; Johnson then told him what Hopkins had said about his (Johnson's) responsibility, and being the owner of property, and of his being about to run away, as it had been told to me by Hopkins, as before stated; Kiersted replied that Hopkins was a damn'd liar, and was trying to injure Johnson; Johnson then left; that he (Teter) then told Kiersted what Johnson had said about buying the " Le Bar "

farm; that Kiersted told him to ask Johnson about it when he came back; told Kiersted that Hopkins said Johnson did not own the farm; when Johnson returned, asked him whether he had bought the " Le Bar" farm and paid $500 on it; this was in the presence of Kiersted; Johnson said he had bought it, and had paid $500 on it, and had a better right to it than Hopkins, or any other man; Kiersted then said that he had signed a note for Johnson for $140, and that Johnson had paid it, and that he (Kiersted) would sign this; told Kiersted that Harwood was not going to let Johnson have the horse in this way; Kiersted replied that Johnson was good, and Hopkins was trying to injure him, and he would sign the note, and Harwood had better let Johnson keep the horse; Kiersted said Hopkins was saying these things to injure Johnson, and that Johnson was as good as Hopkins; this conversation was at the time Kiersted signed the note; Harwood let Johnson retain the horse; saw Hopkins have the horse afterwards.

Cross-examined. Drew this note for the parties on Saturday; it was then delivered by Johnson to Harwood; the horse was delivered by Harwood to Johnson the same day; the talk with Hopkins, Johnson and Kiersted was on Monday; Johnson said to Kiersted, " don't you think the rascal Hopkins says I am going to run away;" Harwood told Johnson that he would have his horse or the pay for it; that he (Teter) had stated all the agreement there was about it. Here the testimony closed on both sides, and which was all the testimony in the case.

Instructions on the part of the plaintiff, and given by the court:

1st. That the note sued upon, and given in evidence in this case, is a joint and several note, and although it shows upon its face that Kiersted is only the surety, that that does not alter the form of the instrument, and that, by the form of the promissory note given in evidence, each of the signers, John Johnson and George H. Kiersted, is liable as an original promissor, and the action is well brought against them as joint makers.

2nd. That although the jury may believe, from the evidence, that the plaintiff Harwood was, in good faith, and believing that he had a right so to do, about to replevy the horse, for which the note was given, or personally to take possession of him and rescind the contract; and that, in consideration that Harwood would permit Johnson to retain possession of the horse, Kiersted signed the note; and that, in consideration of Kiersted's signing the note, Harwood did permit Johnson to keep the horse, the consideration was sufficient to bind Kiersted for the amount specified in the note.

3rd. That although the jury may believe, from the evidence, that Kiersted signed the note a couple of days after it had been signed by Johnson, yet the parties to the note had a right to put it into such a shape, in reference to the date, as they saw proper, and might agree that Kiersted's liability should relate back to the date of the note, and that agreement may be as well implied from all the circumstances in proof, in reference to Kiersted's signing the note, as though it had been by express agreement, provided that the jury are satisfied that such was the intent of the parties.

4th. That if the jury believe, from the evidence, that Harwood gave to Kiersted, at the time, or immediately before Kiersted signed the note, all the information in reference to the ability of Johnson to pay, as well as all the information he had in reference to Johnson's honesty and integrity, and the intentions of the said Johnson, the law is for the plaintiff, and Kiersted cannot avoid the payment of the note by alleging fraud practiced upon him by Harwood, in withholding information.

5th. That the evidence given by the defendant, in reference to the time that Kiersted signed the note, was let in to the jury for the purpose of showing the consideration of Kiersted's signing the note, and not to change the form of the instrument, for the form of the instrument cannot be changed by parol testimony, and if Kiersted is liable upon the note, the action is well brought against him and Johnson jointly.

6th. That if the jury believe, from the evidence, that Johnson stated to Harwood, at the time that the contract was made for the horse, for which the note was given, that he (Johnson) had bought a farm, called the " Le Bar " farm, on which he had paid $500, and which he still held, and that in addition to that, he was the owner of several head of horses, and that the statement so made by Johnson was false ; and if they further believe, from the evidence, that Harwood, at the time the horse was sold, relied upon the statements of Johnson as to his ability to pay, the false representations thus made to Johnson were a fraud upon Harwood, and gave him the right to rescind the contract.

Instructions on the part of the defense, but objected to on the part of the plaintiff : objection overruled, and plaintiff excepted.

1st. If the jury believe, from the evidence, that the note offered in evidence by the plaintiff was not signed as security by the defendant Kiersted, contemporaneous with the time it was executed and delivered to plaintiff by Johnson, and not until some days after the original transaction and delivery of the note, Kiersted would not be liable, unless some new and valid consideration be proved.

2nd. That the original consideration of the note would not support the promise of Kiersted, unless the jury believe, from the evidence, that Kiersted signed the note at the time of the original transaction and execution of the note.

3rd. If the jury believe, from the evidence, that the consideration for which Kiersted signed the note was that the plaintiff would not commit a trespass upon the property or person of Johnson, such consideration is not legally binding.

4th. That an agreement to forbear a suit must be mutually understood, agreed upon in terms, and binding, to support a consideration of guaranty, and, therefore, if the jury believe, from the evidence, that no suit of any kind was mentioned or agreed to be forborne by Harwood against Johnson at the time Kiersted signed the note, and that such signing was done after the original transaction and delivery of the note between Johnson and Harwood, then it is not competent for the plaintiff to set up the forbearance of Harwood to sue Johnson in support of the new consideration.

The County Court gave judgment for costs against the plaintiff in the court below.

This cause was argued at the previous term, when the following opinion was prepared by Mr. Justice SCATES, but was withheld from record. The opinion has been adopted by the justices at the present term, as their opinion and judgment.

SEELEY & BAUGHER, for Plaintiff in Error.

S. W. HARRIS, for Defendants in Error.

SCATES, J. Promises and agreements, as between the parties, to be binding, must be made upon a legal consideration.

And this consideration is equally necessary to support the promise of mere sureties and guarantors. Where the original agreement is that sureties shall sign it, and a guaranty be given, the original consideration between the parties will support the promise of the surety or guarantor. *Camden et al.* v. *McKoy et al.*, 3 Scam. R. 441; *Klein* v. *Currier*, 14 Ill. R. 237; *Neelson* v. *Sanborne*, 2 N. Hamp. R. 413; *Bailey* v. *Freeman*, 11 John. R. 221; *Wheelwright* v. *Moore*, 2 Hall R. 148; *Flagg* v. *Upham*, 10 Pick. R. 147.

Guaranties, being collateral undertakings for the debt of another, should not only be in writing to be binding under the statute of frauds, but, according to the English rule laid down on this subject, the consideration as well as the promise must be expressed in the writing. *Main* v. *Warlters*, 5 East R. 10;

*Saunders* v. *Wakefield*, 4 Barn. and Ald. R. 595; *Jenkins* v. *Reynolds*, 3 Brod. and Bing. 14.

But this has not been followed in many of the States—parol evidence being admitted to show the consideration. *Packard* v. *Richardson*, 17 Mass. R. 122; *Leonard* v. *Vredenburgh*, 8 John. R. 29; *De Wolf* v. *Raband et al.*, 1 Pet. R. 501.

Still, whether the consideration be in the writing signed by the surety or guarantor, or be shown by parol evidence, the original consideration between the parties, with some exceptions introduced by statute, as when further security is given by an officer, an administrator or guardian, as in *Ammons* v. *The People*, 11 Ill. R. 7, will not support the promise of one who subsequently signs the obligation as surety or as a guarantor. A new consideration must be shown. *Clark* v. *Small & Brown*, 6 Yerg. R. 418; 8 John R. 29; *Tenny* v. *Prince*, 4 Pick. R. 385; *Same* v. *Same*, 7 Pick. R. 242.

That consideration may be a subsisting legal obligation to do the same thing promised, or a moral obligation to discharge an old legal one not enforcible, *Cook* v. *Bradley*, 7 Conn. R. 57; or some matter of advantage to the promissor, or the debtor, or of detriment to the promissee—as forbearing suit, or other legal remedy or redress—Chit. on Cont. 35 to 38—whether commenced or not—id. 36 a; the waiver of a legal right at the request of another, id. 33, note 2; or the waiver of a tort, and with agreement to prove under a bankruptcy. *Brealey* v. *Andrew*, 2 Nev. & Perry R. 114; S. C. 7 Adol. & Ellis R. 108. And a guaranty may have a retrospective operation, so as to embrace debts already contracted, where it clearly appears that such was the intention of the parties. *Abrams* v. *Pomeroy et al.*, 13 Ill. R. 133.

Tested by these principles, and there appears ample evidence to sustain the promise of defendant on signing this note as surety, though signed a day or so after its execution by Johnson.

There can be no question that he obtained credit for the mare, and induced plaintiff to take the note, by false and fraudulent representations, proved be to such by the very person to whom he referred plaintiff to sustain his credit and coroborate his statements.

Upon making discovery of this fraud, and being informed of Johnson's intention of leaving the country, plaintiff determined to rescind the contract for the fraud, and reclaim his mare. This he immediately proceeded to do, charging Johnson with the fraud and design of leaving as he was informed. Johnson proposed to give security—when defendant, on being informed of all these circumstances, agreed to and did become his surety, declaring that it was not true, and was intended to injure John-

son. We cannot doubt plaintiff's intention and right to redress his wrong, and that he would have done so but for the interposition of defendant, and that defendant interposed with a view to arrest that course, with a full knowledge of all the facts. Plaintiff's forbearance to pursue his redress while in his power, would cause him the loss of his mare, if not permitted to enforce the promise upon faith of which he relied.

This state of things was manifest from all the circumstances of what was said and done, and needed no agreement in terms to be mentioned, as declared in the last instruction for defendant. We think the instruction erroneous, and calculated to mislead the jury, by impressing upon them the idea that the facts showing an intention to bring suit, and a forbearance to do so, must appear by express agreement. It may appear by implication from the circumstances, the declarations and acts of the parties, as well as by agreements.

We can lay no stress upon the want of a formal offer to return the note at the time plaintiff reclaimed the mare.

We think the jury have clearly mistaken the rights of the plaintiff, and the liability of the defendant, under this evidence, and that a new trial ought to be granted.

Judgment reversed and cause remanded for a new trial.

*Judgment reversed.*

We concur in the judgment reversing the judgment below, and in the opinion.

O. C. Skinner,
J. D. Caton.